### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>**Plaintiff,**<br><br>**vs.**<br><br>**RADOSLAV BOEV,**<br>**Defendant.** | **CASE NO. 2:20-CR-030**<br><br>**JUDGE JAMES L. GRAHAM**<br>**MAGISTRATE JUDGE NORA M. KING** |

### UNITED STATES' MEMORANDUM IN OPPOSITION
### TO MOTION TO RECONSIDER DENIAL OF EMERGENCY RELEASEDUE TO THE
### COVID-19 GLOBAL PANDEMIC

For the reasons set forth below, the United States opposes this defendant's pretrial release.

### LEGAL STANDARD

The Bail Reform Act provides that a defendant shall be detained pending trial if the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).  In making that determination, the Court should consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  *Id.* § 3142(g).

When the Court finds that there is probable cause to believe that a defendant committed one of the crimes listed in § 3142(e)(3)—including, as relevant here, "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act"—there is a presumption in favor of detention.  18 U.S.C. § 3142(e)(3).  A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime

with which he is charged.  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).  "Thus, when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention."  *Id.*

Although § 3142(e)(3)'s presumption in favor of detention imposes a "burden of production" on the defendant, the government retains the "burden of persuasion."  *Stone*, 608 F.3d at 945.  A defendant satisfies his burden of production when he "'com[es] forward with evidence that he does not pose a danger to the community or a risk of flight.'"  *Id.* (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).  The burden of production "is not heavy," but the defendant must introduce "at least some evidence."  *Id.*

Even when a defendant satisfies his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."  *Stone*, 608 F.3d at 945 (internal quotations omitted).  The presumption "remains as a factor," because it "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial."  *Id.*

A detention hearing may be reopened at any time before trial "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."  18 U.S.C. § 3142(f).

While Boev details his medical conditions at some length in his Motion for Reconsideration, he fails to demonstrate why the preventative measures and expertise at facilities housing BOP detainees cannot continue to provide for his continued health and safety.  Is necessary for the United States to point out two key facts for the Court to consider.  First, Mr.

Boev has been detained in both the SDNY and the SDOH since January 19, 2020 and has not

contracted the COVID-19 virus, thus demonstrating that the BOP facilities where he has been

housed are more than capable of continuing to protect Mr. Boev, as it has for four and a half

months, from exposure to the virus.  Second, Mr. Boev gives no mention to the extensive actions

taken by the BOP in response to the COVID-19 pandemic, which the United States will detail for

the Court.

I.       **BOP's Response to the COVID-19 Pandemic**

As this Court is well aware, COVID-19 is a dangerous illness that has caused many

deaths in the United States in a short period of time and that has resulted in massive disruption to

our society and economy. In response to the pandemic, BOP has taken significant measures to

protect the health of the inmates in its charge. BOP has explained that "maintaining safety and

security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19

Action Plan: Inmate Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health

Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct.

2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf  That protocol is

lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin

preparations when there is first a "[s]uspected human outbreak overseas." (Id. at i). The plan

addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment

of symptomatic inmates. Consistent with that plan, BOP began planning for potential

coronavirus transmissions in January. At that time, the agency established a working group to

develop policies in consultation with subject matter experts in the Centers for Disease Control,

3

including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.  Contractor access to BOP facilities is

restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to

5

place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

6

## **ARGUMENT**

The government and the defense agree that COVID-19 is a dangerous and infectious virus. But the inquiry before the Court is that set out by 18 U.S.C. § 3142: whether Boev can be released on conditions sufficient to reasonably assure the safety of the community and his appearance as required. *See United States v. Venham*, No. 2:19-CR-234, Dkt. 20, at 4 (S.D. Ohio Mar. 27, 2020) (Marbley, J.) (explaining, in the context of a motion for pretrial release due to COVID-19, that "resolving a motion for a detention hearing must, in the first instance, be an individualized assessment of the factors identified by the Bail Reform Act"). As explained below, neither the virus nor any alleged facts in Boev's motion—even if true—justify releasing him pretrial.

### **I.  Even assuming that Boev is at-risk, the Court should deny his motion.**

Even assuming that Boev has a medical condition that makes him at a higher risk for medical difficulty if exposed to COVID-19, the Court should deny his motion, because the § 3142(g) analysis shows that he presents a danger to the community and a risk of flight. Moreover, Butler County Jail has taken aggressive steps to protect inmates from infection. Additionally, Boev makes no substantive argument as to any of the factors § 3142(g) directs the Court to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

A full consideration of the § 3142(g) factors shows that there are no conditions that can reasonably assure Boev's appearance as required or the safety of the community. Boev is charged with a drug-trafficking crime that Congress has concluded raise a presumption of dangerousness—a presumption that Boev has the burden of production to rebut, which he has

failed to do.  As to the second factor, the weight of the evidence against Boev is overwhelming: As the affidavit in support of the complaint makes clear, investigators made multiple controlled purchase of GHB from BOEV, he was caught with a home laboratory full of GHB, and he admitted to investigators that he was involved in the manufacture and distribution of GHB.

As to the third factor—the defendant's history and characteristics—Boev argues that he is not a flight risk., but this argument has already been rejected due to his ties to a foreign country.

As to the final factor—the nature and seriousness of the danger to any person or the community that would be posed by the person's release—the risk is great.  The evidence is clear that Boev was engaging in large-scale narcotics manufacturing and trafficking.  Releasing him would present a serious risk to the public.

The foregoing analysis shows that Boev has not rebutted the presumption in favor of detention.  He presents both a risk of flight and a danger to the community.  The only remaining question is whether, assuming that Boev is somewhat at risk if exposed to COVID-19, this should affect the Court's analysis.

On the facts before the Court, the answer is no.  The government is informed that Butler County Jail, where Boev is currently housed, has taken aggressive steps to combat the spread of the virus by limiting interactions with individuals who may be infected.  All visitation has been suspended, with the exception of attorney visits.  When attorneys visit, they must do so while separated from the inmate by a glass window.  If anyone reports or is observed feeling sick, the jail immediately isolates that person, continues to check temperatures frequently, and keeps the person isolated until a test for COVID-19 comes back negative.  As a result of these measures, Butler County Jail currently has no known COVID-19 infections.

Simply put, the COVID-19 pandemic does not make Boev any less of a flight risk or any

less of a danger to the community.  The facts justifying Boev's detention in January of 2020 remain true today.  Boev should remain detained pending trial.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court deny Boev's motion for reconsideration.

DAVID M. DEVILLERS
United States Attorney


s/Michael J. Hunter
MICHAEL J. HUNTER
Assistant United States Attorney



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Response in Opposition was served on attorney for defendant, George Chaney, via this Court's ECF system on June 1, 2020.

s/Michael J. Hunter
MICHAEL J. HUNTER
Assistant United States Attorney

9